**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

UNITED STATES OF AMERICA,

          Plaintiff,

vs.

PATRICK LAYNE STEFFENS and
JEREMY WILLIAM LILLICH,

          Defendants.

No. 19-CR-4022-LTS-KEM

**ORDER ON REPORT AND
RECOMMENDATION**

———————————

*I.*    *INTRODUCTION* ................................................................. 2

*II.*   *BACKGROUND* ................................................................. 2

   *A.*   *Procedural History* ................................................................. 2

   *B.*   *Relevant Facts* ................................................................. 3

*III.*  *APPLICABLE STANDARDS* ................................................. 8

*IV.*  *DISCUSSION* ................................................................. 9

   *A.*   *Lillich's Objections to the Factual Findings* ......................... 10

   *B.*   *Legality of the Initial Encounter* ...................................... 11

       *1.*   *Judge Mahoney's Analysis* ...................................... 11

       *2.*   *The Government's Objection* .................................... 13

       *3.*   *Lillich's Objections* ................................................ 13

       *4.*   *Steffens' Objections* .............................................. 15

       *5.*   *Analysis* .............................................................. 15

   *C.*   *Legality of the Second Encounter* ..................................... 28

       *1.*   *Judge Mahoney's Analysis* ...................................... 28

       *2.*   *The Government's Objection* .................................... 31

       *3.*   *Lillich's Objections* ................................................ 31

       *4.*   *Analysis* .............................................................. 33

1

**D.** **Lillich's Motion to Suppress Due to Lack of Miranda Warnings**..................40

    **1.** *Judge Mahoney's Analysis*............................................................40

    **2.** *Lillich's Objection*.................................................................40

    **3.** *Analysis*.........................................................................41

  **E.** **Steffens' Arguments to Suppress Evidence from His Cell Phone**..............42

    **1.** *Judge Mahoney's Analysis*............................................................43

    **2.** *Steffens' Objection*...............................................................44

    **3.** *Analysis*.........................................................................45

  **F.** **Lillich's Motion to Sever**.............................................................47

    **1.** *Judge Mahoney's Analysis*............................................................47

    **2.** *Lillich's Objection*.................................................................48

    **3.** *Analysis*.........................................................................48

**V.** **CONCLUSION** ........................................................................50

# I.     INTRODUCTION

This matter is before me on a Report and Recommendation (R&R) by the Honorable Kelly K.E. Mahoney, Chief United States Magistrate Judge.  Doc. No. 75. Judge Mahoney recommends that I (1) grant in part and deny in part Jeremy Lillich's motion to suppress evidence related to his first and second encounters with law enforcement (Doc. No. 27), (2) deny Patrick Steffens' motion to suppress (Doc. No. 50), (3) deny Lillich's motion to suppress related to the lack of *Miranda* warnings (Doc. No. 56) and (4) deny Lillich's motion to sever (Doc. No. 42).

# II.     BACKGROUND

## A.     Procedural History

On March 20, 2019, a grand jury returned an indictment (Doc. No. 3) charging defendants Steffens and Lillich with one count of conspiracy to distribute a controlled substance in violation of 21 U.S.C. §§ 546 and 541(a)(1) and one count of possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 541(a)(1).

Lillich filed his first motion to suppress evidence (Doc. No. 27) on April 16, 2019, which was followed by a motion to sever the defendants' trial (Doc. No. 42) on May 8, 2019, and a second motion to suppress evidence (Doc. No. 56) on May 23, 2019. The Government resisted each of these motions. Doc. Nos. 41, 45, 67. Steffens also filed a motion to suppress evidence and request a *Franks* hearing (Doc. No. 50) on May 22, 2019. The Government resisted this motion as well. Doc. No. 58.

Judge Mahoney held an evidentiary and *Franks* hearing on the motions on June 20, 2019. During the hearing, Judge Mahoney received Government's Exhibits 1 through 6 and defendants' Exhibits A through C into evidence.[1] She then issued her R&R on July 23, 2019. The Government (Doc. No. 84), Lillich (Doc. No. 85) and Steffens (Doc. No. 86) filed objections to the R&R on August 12, 2019.

### B. Relevant Facts

Judge Mahoney made detailed factual findings in her R&R. Doc. No. 75 at 2–9. Only Lillich raises specific objections to the factual findings.[2] *See* Doc. No. 85 at 4. Nonetheless, I adopt Judge Mahoney's factual findings as summarized in the R&R.

> In the early morning hours of February 3, 2019, Sergeant Lenz and a reserve deputy with the Woodbury County Sheriff's Office were on patrol in the small town of Sloan, Iowa, due to break-ins the night before at a church and a school. They noticed a vehicle in a car wash bay (around 3:00 a.m.) and decided to observe from a short distance away. Sergeant Lenz was concerned about a possible burglary, given the break-ins the night before, the late hour, and recent car wash burglaries in the surrounding area. With regard to the latter, Sergeant Lenz testified that he receives

---

[1] For the sake of consistency with the R&R and the parties' briefs, I will refer to any exhibits using the numbers and letters assigned by the parties, rather than by their docket numbers.

[2] Lillich objects to Judge Mahoney's factual finding that law enforcement officers "recognized Lillich's name as a person involved with drugs." Doc. No. 85 at 4. He also objects to the R&R's repeated reference to the law enforcement officer Michael Lenz as a "Sergeant," when his actual rank is "Deputy." *Id.* Lastly, Lillich objects to the factual finding that Lenz told Lillich "you might have a warrant" after Lillich asked to leave. *Id.* at 5. Lillich argues that this was either a scrivener's error or an incorrect factual finding because the record should read "he might have a warrant." *Id.* I will address these objections in a later section of this Order.

3

notifications that contain information about what occurred in Woodbury County on the previous shift, as well as a summary of crimes in surrounding counties. Through these notifications and word-of-mouth from other officers, he knew about car wash burglaries in Lawton, Correctionville, and Sergeant Bluff (towns in Woodbury County); as well as car wash burglaries in Monona County, Iowa; and Cherokee County, Iowa. Sergeant Lenz could not give any specifics about these burglaries—including any information about the suspects, how long ago the burglaries occurred, and the time of day they occurred—other than that the Lawton burglary involved a cash machine outside a bay being ripped from the wall and that the Sergeant Bluff burglary involved cash machines being broken into. Sergeant Lenz also knew about an attempted burglary of the money lockbox at the Sloan car wash about a month prior, which occurred on January 1, 2019, at around 7:00 p.m. *See* Doc. 74.

The Sloan car wash has two manual car wash bays that are open and lit twenty-four hours. Both bays have two doors, so that a person can drive in, stop and wash their car, and then drive out. The owner of the car wash testified that the bay doors are kept closed in the winter months so the bays stay heated. The south bay (entrance) doors are manual, opened and closed by rope pulleys. The north bay (exit) doors are automatic—they open by pressing a button and automatically close when the car drives over a sensor.

On the night in question, as the officers drove by the car wash, they could see a vehicle and a person's feet in a car wash bay that had the door closed, next to an empty bay that had the door open (an automatic exit door). Sergeant Lenz turned around, drove back past the carwash, and parked about half a city block away from the car wash with the lights off. From that location, Sergeant Lenz testified that they could see all the way into the back of the open car wash bay. He testified that he observed a person walk from the closed bay through a doorway to the back of the open bay, and then back into the closed bay, and that he believed the person might have been acting as a lookout (or coming to investigate based on the sound of Sergeant Lenz's car driving by). Surveillance video from the car wash shows that Steffens walked just outside the doorway in between the occupied and unoccupied car wash bays, stopped briefly (about one second) in the back of the unoccupied car wash bay with his body angled toward the open bay door, and then returned to the occupied bay. *See* Govt. Ex. 2A, 3:03:15-24 (video from the unoccupied bay—Steffens is visible in the bottom right corner); Govt. Ex. 2B 3:03:15-24 (video from the occupied bay). This is the only instance of Steffens leaving the occupied bay or

otherwise looking out of it. Although it could be said that Steffens "looked out" of the car wash bay from the back of the bay, the surveillance footage shows he did not turn his head or otherwise "look around" in any way.

After seeing Steffens, the officers decided to investigate further. Sergeant Lenz and the reserve deputy entered the bay occupied by Defendants by walking through the open garage bay door of the empty bay and walking the length of the empty bay to the open door between the two bays (the door Steffens had just appeared in). They announced their presence as law enforcement as they did so (and Sergeant Lenz carried a flashlight). They wore their sheriff's deputy uniforms with their weapons holstered and visible on their person.

In the car wash bay, they discovered Lillich and Steffens drying a car with the hood popped. They did not see any evidence indicating that Lillich and Steffens planned to burglarize the car wash. Sergeant Lenz asked Lillich and Steffens what they were doing at the car wash at 3:00 a.m., and Lillich responded that they had just been at the WinnaVegas Casino and that he often washes his car after going to the casino. Sergeant Lenz testified that in the past, he has been dispatched to the WinnaVegas Casino for drug trafficking activity and that the Woodbury County Sheriff's Office encounters drugs connected to the WinnaVegas Casino on an almost daily basis.

Sergeant Lenz explained to Lillich and Steffens that he was checking in based on the recent burglaries. He asked them for their identification, explaining that he needed their names for the report he would write about the contact. Steffens handed Sergeant Lenz a driver's license, and Lillich gave him an identification card, explaining that he was barred from driving and that Steffens had been driving the car. Sergeant Lenz recognized Lillich's name as a person involved with drugs. Sergeant Lenz radioed Lillich's and Steffens's information to dispatch, and while waiting for the results, he talked with Lillich and Steffens about their future plans for the night (they stated they were headed back to Sioux City).

After being on the scene for about four minutes, Sergeant Lenz went back to his car to scan the identification cards, while the reserve deputy stayed in the bay with Steffens and Lillich. The surveillance video from the car wash depicts Lillich seemingly asking the reserve deputy for permission to continue cleaning his car (which was granted—the reserve deputy gestures as if saying, "go ahead"). *See* Govt. Ex. 2B, 3:08:22. Shortly after

5

Sergeant Lenz left the bay (about thirty seconds), another sheriff's deputy (Deputy Simoni) arrived and stood in the doorway between the two bays. While Sergeant Lenz was gone, Lillich and Steffens dried the car, and at various times, shut the hood and opened the driver's side and passenger side doors to access items in the car.

Sergeant Lenz returned after about three minutes and gave Lillich and Steffens their identification cards back. All three officers started to leave, going into the unoccupied car wash bay and walking across it toward the open bay door. Sergeant Lenz testified their encounter with the Defendants had ended and the deputies were leaving the scene. But before they made it to their cars, they received a notification from dispatch that there was a "hit" on Steffens for a United States Marshals hold and the existence of a federal arrest warrant related to "dangerous drugs." Because of the possible warrant for Steffens, the officers returned to the car wash bay occupied by Steffens and Lillich (about thirty seconds after they had left it). The officers did not immediately arrest Steffens on the warrant, as the existence of the warrant was not verified until about thirty minutes later.

Instead, the officers questioned Lillich about his car. Lillich told the officers that he had purchased the car from Jimmy Merchant—who both Sergeant Lenz and Deputy Simoni knew to be "a thief" and involved in drugs. Deputy Simoni asked whether Lillich knew for sure the vehicle was not stolen, saying he "wouldn't trust Jimmy for nothing." An officer asked Lillich how much he had paid for the vehicle, and Lillich told him. During this questioning, Lillich held a car floor mat that he had been wiping down, and he asked Sergeant Lenz whether he could put the car mat back inside the car. Sergeant Lenz responded, "yeah, if you want to." The driver's side door was already open, and Lillich put the mat back in the car.

When he came back to where the officers were standing, Lillich asked, "Are we free to go?" Govt. Ex. 1, 1:11. Sergeant Lenz responded, "No, not right now, you might have a warrant, so we're just checking on that." Sergeant Lenz then conducted a pat-down search of Steffens. During the search, he discovered a baggie of methamphetamine. Sergeant Lenz arrested Steffens and placed him in the back of his car. He also seized Steffens's cell phone.

Because Lillich was barred from driving, when Steffens was handcuffed, Deputy Simoni suggested that Lillich "start calling" someone for a ride. Lillich tried to access his car to get his cell phone, but Sergeant

Lenz blocked his path, explaining that he "did not know what's in there" but that an officer could retrieve the phone for Lillich. Deputy Simoni went into the car through the open driver's side door and looked for the phone but could not find it. While Deputy Simoni looked for the phone, the reserve deputy conducted a pat-down search of Lillich. No drugs were found on Lillich's person, although the officers did confiscate a small knife (which Deputy Simoni asked Lillich to remind him to return at the end of the encounter). Officers continued to look for the phone in the car, and eventually, Lillich rescinded his request for them to look for his phone.

After finding drugs on Steffens, officers called a K-9 officer to the scene to conduct a drug dog sniff of Lillich's car (that Steffens had been driving). While they waited for the K-9 officer, Lillich was not free to leave the scene (indeed, he asked to step outside, and the officer did not permit him to leave the car wash bay; he also asked if he could walk to the casino to find someone there to give him a ride, and the request was denied). Sergeant Lenz told Lillich, "It was a little weird, I was sitting up the street watching you guys, and [Steffens] kept peeking his head around the corner." Govt. Ex. 1, 9:59. He elaborated that he had seen Lillich look into the unoccupied bay and out through its open door. Lillich denied it, and Sergeant Lenz responded sarcastically, "Okay, then I'm seeing stuff." Lillich responded, "I think you are." Sergeant Lenz stated, "I don't think so." Sergeant Lenz asked whether Lillich and Steffens were meeting anyone at the car wash (implying he believed a drug transaction was to occur). Lillich stated that Steffens "did not peek his head around the corner one time," and Sergeant Lenz said that was what drew his attention to the car wash and was the reason he was there.

Officers testified that Lillich began chain smoking and became very sweaty, despite the 40-degree weather—to the point that Sergeant Lenz was concerned that Lillich had swallowed drugs because he was sweating so profusely. Lillich's face can be seen glistening with sweat in the body camera video. *See* Govt. Ex. 4, 22:00. At some point, Lillich asked whether he was under arrest, and an officer explained that he was currently being detained, but he was not under arrest.

When Sergeant Sands and his K-9 Rico arrived, they conducted a drug dog sniff of Lillich's vehicle. Rico alerted on the car. When officers searched the vehicle, they found approximately two pounds of methamphetamine and twenty-eight grams of cocaine inside a bag on the passenger's seat.

7

At a later date after Defendants' arrest, I issued a federal search warrant for Steffens's cell phone based on a supporting affidavit from Officer Howard. *See* Docs. 50-2, 50-3. Officer Howard prepared the affidavit based on his review of the officers' reports and by speaking with Sergeant Lenz on the telephone; he did not review the video evidence. The affidavit includes the following statements:

> [Sergeant] Lenz observed a subject looking out of the wash bay and looking around in a suspicious way as if the subject was looking for someone or watching out for potential police. [Sergeant] Lenz was aware that recent burglaries had occurred in the Sloan area in the overnight hours as well as having experience with subjects entering the wash bays and drilling through the locks to steal the money from the wash machines.

Doc. 50-2. The only information in the affidavit specifically about Lillich's and Steffens's use of cell phones is from a post-arrest interview with Steffens, where Steffens stated that on the night of his arrest, a third party (who he refused to name) had called and told him to go to the WinnaVegas casino to pick up Lillich (who Steffens knew only as "J") and give him a ride. Steffens said that he received a ride to the casino and met with Lillich, who told him to drive his car to Sioux City because he did not have a valid driver's license. Lillich also instructed Steffens to drive to the car wash so Lillich could wash his car. The affidavit also included a "belief statement" from the officer regarding his knowledge of the use of cell phones in drug trafficking activity.

Doc. No. 75 at 2–9 (footnotes omitted).

## III.   APPLICABLE STANDARDS

A district judge must review a magistrate judge's R&R under the following standards:

> Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may

8

> accept, reject, or modify, in whole or in part, the findings or
> recommendations made by the magistrate judge. The judge may also receive
> further evidence or recommit the matter to the magistrate judge with
> instructions.

28 U.S.C. § 636(b)(1); *see also* Fed. R. Crim. P. 59(b). Thus, when a party objects to any portion of an R&R, the district judge must undertake a de novo review of that portion.

Any portions of an R&R to which no objections have been made must be reviewed under at least a "clearly erroneous" standard. *See, e.g.*, *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting that when no objections are filed "[the district court judge] would only have to review the findings of the magistrate judge for clear error"). As the Supreme Court has explained, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). However, a district judge may elect to review an R&R under a more-exacting standard even if no objections are filed:

> Any party that desires plenary consideration by the Article III judge of any
> issue need only ask. Moreover, while the statute does not require the judge
> to review an issue de novo if no objections are filed, it does not preclude
> further review by the district judge, sua sponte or at the request of a party,
> under a de novo or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 150 (1985).


## IV. DISCUSSION

The Government, Lillich and Steffens have all filed objections to the R&R. First, I will address Lillich's objections to the factual findings in the R&R. Second, I will address the Government's, Lillich's and Steffens' objections regarding the legality of the initial encounter between law enforcement officers and the defendants. Third, I will address the Government's and Lillich's objections regarding the legality of the second encounter. Fourth, I will address Lillich's motion to suppress due to the officers' failure

9

to provide *Miranda* warnings. Fifth, I will address Steffens' arguments regarding the warrant permitting the search of his cell phone. Finally, I will address Lillich's motion to sever.

### A. Lillich's Objections to the Factual Findings

Lillich has raised 13 objections to the R&R.[3] Doc. No. 85. Three of the objections relate to Judge Mahoney's factual findings.

In his fourth objection, Lillich argues against the finding that Deputy Lenz recognized Lillich's name as one connected with drugs. *Id.* at 4. Lillich contends "that Lenz was not familiar with Mr. Lillich (or his name) until much later in the action" and that Judge Mahoney improperly used this mistaken fact in concluding that the officers had a valid reason to detain Lillich and his vehicle. *Id.*

The only evidence in the record regarding Lenz's prior knowledge of Lillich comes from Lenz's testimony at the suppression hearing. Doc. No. 89 at 36. Lenz answered in the affirmative when asked whether he knew Lillich was "previously involved with drug trafficking." *Id.* Judge Mahoney found this testimony credible and included it in her factual findings. Without evidence to the contrary, I find no reason to discredit this finding.[4] *Cf. United States v. West*, 589 F.3d 936, 938 (8th Cir. 2009) (citation omitted) (noting that credibility determinations by the court who heard the witness are "virtually unreviewable").

In his fifth objection, Lillich argues that the R&R mistakenly identifies Lenz as a "sergeant." Doc. No. 85 at 5. Lillich argues that this mistake contributed to Lenz receiving an unwarranted assessment of credibility from Judge Mahoney. *Id.* I agree

---

[3] Lillich lists 14 objections but skipped number 10. Doc. No. 85. I will refer to Lillich's objections in the order he raised them, not necessarily by the number he gave them.

[4] Judge Mahoney discounted Lenz's testimony on some points when it was contradicted by video evidence. This is discussed below. However, I find Lenz's overall testimony regarding Lillich to be credible.

with Lillich that the R&R mistakenly refers to Lenz as "Sergeant Lenz." At the suppression hearing, Lenz's position was referred to as "road deputy." Doc. No. 89 at 14. However, I do not agree with Lillich that this error caused Judge Mahoney to inappropriately weigh the Lenz's credibility. Nothing in the record supports this assertion. Instead, I find that this is mere scrivener's error. While the error is noted, it has no impact on the R&R. Lillich's fifth objection is overruled.

In his seventh objection, Lillich challenges the R&R's record of Lenz's response after Lillich requested to leave. Doc. No. 85 at 5. Lillich argues that the statement should read "he might have a warrant," not "you might have a warrant." *Id.* Lillich contends that this is either a scrivener's error or an incorrect factual determination by Judge Mahoney. *Id.* I find that Judge Mahoney's factual finding is accurate. It was neither a scrivener's error nor incorrect factually. In the video from Lenz's body camera, Lenz indeed said "you might have a warrant." Gov't Ex. 1 at 01:11–:15. The video also shows Lenz gesturing towards Steffens while making the statement, and Steffens in turn acknowledged that Lenz referred to him. *Id.* Therefore, I find no error. Lillich's seventh objection is overruled.

## B.    *Legality of the Initial Encounter*

### 1.    *Judge Mahoney's Analysis*

To determine whether any Fourth Amendment violations occurred during the officers' initial encounter with the defendants, Judge Mahoney first addressed whether the encounter constituted a *Terry* stop or a consensual encounter. Doc. No. 75 at 10–12. Noting that it "is a close issue," Judge Mahoney concluded that the initial encounter was a *Terry* stop because "a reasonable person would not have felt free to leave." *Id.* at 13. She explained:

> Sergeant Lenz kept Steffens's driver's license and Lillich's identification card, without which "a reasonable person is much less likely to believe he can simply terminate a police encounter." Two officers were on the scene originally, and a third officer arrived and (intentionally or unintentionally)

11

blocked the only open doorway. Even though Defendants remained free to move around within the confines of the car wash bay, and they could have exited by opening the car wash bay garage doors, a reasonable person would have felt that the arrival of an additional officer, who blocked the only easily accessible entrance and exit, combined with Sergeant Lenz retaining their identification cards, meant that Defendants were not free to leave. Examining the totality of the circumstances, I conclude that a seizure occurred here.

*Id.* at 13 (citations omitted).

Having determined that the initial encounter was a *Terry* stop, Judge Mahoney found that it was lawful. *Id.* at 14. In concluding that "the officers had a reasonable, articulable suspicion that criminal activity was afoot," Judge Mahoney cited the following circumstances:

Sergeant [sic] Lenz testified that he found it suspicious someone would be washing his or her car at 3:00 a.m., as he had never seen someone at a car wash that late at night; that there had been two break-ins in Sloan the night before; that he was aware of recent car wash burglaries in nearby towns; and that there had been an attempted burglary at the Sloan car wash about a month prior. It was also reasonable for Sergeant Lenz to find it suspicious that the occupied car wash bay had both garage doors closed, while an empty bay had one garage door open (even though the car wash owner's testimony establishes that it was normal for both car wash bay garage doors to be closed during the winter months). Sergeant Lenz also testified that he saw Steffens act in a manner that he believed was consistent with a lookout.

*Id.* at 14–15 (footnote omitted).

Although much of the officers' suspicion leading to the *Terry* stop related to a potential burglary, Judge Mahoney concluded that their reasonable suspicion did not dissipate just because they did not immediately observe evidence of a burglary after entering the car wash bay. *Id.* at 15.

First, because Sergeant Lenz believed he saw Steffens acting as a lookout, further investigation was necessary to ensure that Defendants were not putting on an act after possibly seeing a marked squad car in the area (especially since Sergeant Lenz drove past the car wash a couple times before parking to watch the car wash). Second, the officers could reasonably ask for Defendant's identification cards within the scope of the

12

*Terry* stop. The initial encounter with Defendants lasted for approximately seven minutes while the officers asked Defendants about their presence in the car wash at 3:00 a.m. and ran the information from their identification cards through dispatch. After seeing no further reason to detain Defendants, the officers started to leave. The duration of the initial *Terry* stop was reasonable.

*Id.* at 15–16 (alteration in original) (citations omitted).

### 2.    *The Government's Objection*

The Government raises one objection to R&R's conclusions regarding the initial encounter. Doc. No. 84. The Government argues that the initial encounter between the defendants and law enforcement was consensual and that no Fourth Amendment seizure occurred. *Id.* at 1–2. In support of this objection, the Government notes that Judge Mahoney considered this to be "a close issue." *Id.* at 1. It argues that the weight of evidence, discussed in prior briefing and presented at the suppression hearing, falls in favor of finding that the initial encounter between law enforcement and defendants was consensual, not a seizure. *Id.* at 1–2. The Government also argues that the defendants could not have had a reasonable belief that they were not free to leave. *Id.* at 2. Although the only open door was blocked by law enforcement, this was not the only exit; there was a closed but accessible garage door the defendants could have used to leave and end the encounter. *Id.* The Government expresses concern that Judge Mahoney's conclusion regarding the occupied open door is unworkable, as "there would almost never be a consensual encounter with law enforcement, unless it occurred on an open street, because in any structure law enforcement would be standing near the entrance at the initial encounter." *Id.* at 2.

### 3.    *Lillich's Objections*

Lillich's first three objections relate to the R&R's conclusions regarding the initial encounter. Doc. No. 85 at 1–4. In his first objection, Lillich agrees with Judge Mahoney

that the initial encounter with law enforcement was not consensual but argues the officers lacked reasonable suspicion to conduct a *Terry* stop. *Id.* at 1. In a footnote accompanying this objection, Lillich attacks five factors Judge Mahoney relied on in finding that the initial *Terry* stop was conducted with reasonable suspicion. *Id.* at 1–3 n.1.

Lillich's arguments against Judge Mahoney's *Terry* stop finding can be outlined in three groups. First, Lillich argues that the time of day Lillich and Steffens were using the car wash and the fact that the car wash bay doors were closed were not sufficiently "suspicious" to warrant a *Terry* stop. *Id.* at 2–3 n.1. Second, Lillich objects to Judge Mahoney's reliance on Deputy Lenz's knowledge of recent break-ins and burglaries in Sloan and surrounding areas. *Id.* Lillich argues that Lenz lacked sufficient knowledge of the specifics of these crimes to justify their use in forming reasonable suspicion. *Id.* Third, Lillich objects to Judge Mahoney's reliance on Lenz's belief that Steffens appeared to be acting as a "lookout." *Id.* Lillich generally agrees with Judge Mahoney's summary of Steffens' behavior,[5] but argues that Judge Mahoney erred by giving any weight to Lenz's statements regarding Steffens' alleged "lookout" behavior when video evidence contradicted some of what Lenz said he witnessed. *Id.*

For his second objection, Lillich contends that Judge Mahoney erred by concluding that reasonable suspicion persisted even though the officers did not discover evidence of a burglary after entering the car wash bay. *Id.* at 3. Lillich again questions Lenz's credibility and argues that his knowledge of the past burglaries was so vague, and their connection to the situation so attenuated, that reasonable suspicion must have dissipated when no signs of a burglary were discovered. *Id.* at 3–4 n.3.

In his third objection, as a continuation of his first two objections, Lillich objects to the seizure of the defendants' identification cards. *Id.* at 4. He argues that "[s]eizure of the identification cards served as the *sine qua non* for further investigation as it is apparent that the officers were, in fact, unfamiliar with the Defendants. The officers

---

[5] *See* Doc. No. 75 at 28–29.

obtained the identification cards as a fruit of the poisoned tree expressed in Objections 1 and 2." *Id.*

### 4. Steffens' Objections

Steffens' objections are similar to some of Lillich's objections. Steffens argues that the car wash he and Lillich were using was open 24 hours a day, and thus there was no reason to find their presence there suspicious. Doc. No. 86 at 2–3. This, combined with the fact that the officers did not discover any evidence of burglary upon entering the car wash bay, meant that any reasonable suspicion the officers may have had dissipated and the officers should have departed. *Id.* at 3. Because the officers continued the investigatory stop beyond the time required to determine whether a burglary was afoot, the stop was an unlawful seizure. *Id.* Thus, all evidence that came after the officers did not discover evidence of burglary should be suppressed. *Id.*

### 5. Analysis

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968)). However, "[l]aw enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200 (2002). "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Such a seizure occurs "when [an] officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quoting *Terry*, 392 U.S. at 19 n.16). A seizure may

15

also occur if a reasonable person "believe[s] he or she is not free to refuse to answer" questions posed by an officer. *United States v. Richards*, 611 F.3d 966, 969 (8th Cir. 2010); *see also Bostick*, 501 U.S. at 439. However, the Fourth Amendment does not require law enforcement officers to inform individuals of their right to refuse to answer questions. *See United States v. Vera*, 457 F.3d 831, 834–35 (8th Cir. 2006) (citing *Drayton*, 536 U.S. at 206–07).

The Eighth Circuit has identified several non-exclusive factors to consider in determining whether an officer has shown force or authority in a way that may restrain a citizen's liberty:

> officers positioning themselves in a way to limit the person's freedom of movement, the presence of several officers, the display of weapons by officers, physical touching, the use of language or intonation indicating compliance is necessary, the officer's retention of the person's property, or an officer's indication the person is the focus of a particular investigation.

*United States v. Griffith*, 533 F.3d 979, 983 (8th Cir. 2008) (citations omitted). When determining whether an encounter is consensual or invokes Fourth Amendment protections, a court must "consider[] the totality of the circumstances" and "the unique facts of each case." *United States v. Aquino*, 674 F.3d 918, 923 (8th Cir. 2012)

Turning to the facts of this case, I find that the initial encounter was consensual. Certainly, there are facts that weigh in favor of finding that the initial interaction was a seizure. However, considering the totality of the circumstances, I find that they are outweighed by the facts that indicate the encounter was consensual.

The main factors that Judge Mahoney relied on in reaching her conclusion that the encounter was not consensual were (1) that Deputy Lenz retained Steffens' and Lillich's identification during the encounter and (2) the only open doorway to the wash bay was blocked, intentionally or unintentionally, by one of the three officers. She concluded that "[e]ven though Defendants remained free to move around within the confines of the car wash bay, and they could have exited by opening the car wash bay garage doors, a reasonable person would have felt that the arrival of an additional officer, who blocked

the only easily accessible entrance and exit, combined with [Deputy] Lenz retaining their identification, meant that Defendants were not free to leave." Doc. No. 75 at 13. Although these are significant factors that indicate the encounter was not consensual, I find that they do not carry great weight in this case.

First, it is true that law enforcement officers blocking an entrance or exit is a factor that weighs in favor of finding that a person has been seized. *See, e.g.*, *United States v. See*, 574 F.3d 309, 313 (6th Cir. 2009) (holding that a seizure occurred when officer used his patrol car to block the defendant's car); *see also United States v. Perez*, 443 F.3d 772, 778 (11th Cir. 2006) (finding a consensual encounter in part because the officer did not obstruct defendants' exit). However, it is not dispositive in every case. *See United States v. Angulo-Guerrero*, 328 F.3d 449, 451 (8th Cir. 2003) (finding that an encounter on a bus was consensual because although the officer stood between the subjects and the bus' only exit, he did not attempt to prevent the subjects from leaving during his attempted questioning).

In *I.N.S. v. Delgado*, 466 U.S. 210 (1984), INS agents conducted surveys at two factories in search of illegal aliens. *Id*. at 212. During the surveys, "several agents positioned themselves near the buildings' exits, while other agents dispersed throughout the factory to question . . . employees at their work stations." *Id*. "The agents displayed badges, carried walkie-talkies, and were armed, although at no point during any of the surveys was a weapon ever drawn." *Id*. While agents questioned some workers, those not being questioned were permitted to continue with their work and "were free to walk around within the factory." *Id*. at 212–13.

The Supreme Court "reject[ed] the claim that the entire work forces of the two factories were seized for the duration of the surveys when the INS placed agents near the exits of the factory sites." *Id*. at 218. The Court explained that the INS agents were more likely positioned at the exits to ensure that all workers could be questioned, not necessarily to prevent people from leaving. *Id*. Even if workers attempted to leave and were possibly questioned while doing so, the workers did not have "any reasonable

17

apprehension . . . that they would be seized or detained in any meaningful way." *Id.*
The Court also noted that the workers were at the factories by choice—to work—and that
the mere presence of agents at the exits "posed no reasonable threat of detention to the[]
workers while they walked throughout the factories on job assignments." *Id.* at 219.

The Supreme Court also considered issues related to confined spaces and blocked
exits in *Florida v. Bostick*, 501 U.S. 429 (1991), which addressed officers' random
encounters with and questioning of passengers on busses. Bostick argued that a
reasonable person would feel that he or she cannot leave when approached by officers on
a bus because of limited space to move around on or exit from the bus. *See id.* at 435–
36; *see also id.* at 442 (Marshall, J., dissenting) (noting that "officers typically plac[ed]
themselves in between the passenger selected for an interview and the exit of the bus").
The Court held that encounters between law enforcement officers and passengers on a
bus are not Fourth Amendment seizures per se just because of the cramped environment
on busses. *Id.* at 439–40. The Court relied on its precedent that a police officer may
approach an individual and ask questions "so long as a reasonable person would feel free
'to disregard the police and go about his business.'" *Id.* at 434, 437 (quoting *California
v. Hodari*, 499 U.S. 621, 628 (1991)). However, the Court altered the emphasis of its
analysis slightly because of the confined nature of a bus:

> The state court erred . . . in focusing on whether Bostick was "free to
> leave" rather than on the principle that those words were intended to
> capture. When police attempt to question a person who is walking down the
> street or through an airport lobby, it makes sense to inquire whether a
> reasonable person would feel free to continue walking. But when the person
> is seated on a bus and has no desire to leave, the degree to which a
> reasonable person would feel that he or she could leave is not an accurate
> measure of the coercive effect of the encounter.

*Id.* at 435–36. The Court further explained its reasoning by comparing the case to
*Delgado*, finding it "analytically indistinguishable":

> Like the workers in [*Delgado*], Bostick's freedom of movement was
> restricted by a factor independent of police conduct—i.e., by his being a
> passenger on a bus. Accordingly, the "free to leave" analysis on which

18

> Bostick relies is inapplicable. In such a situation, the appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.

*Id.* at 436. Thus, as long as the officer's actions did not cause Bostick to feel compelled to answer questions or consent to a search, the encounter was consensual. *See id.* at 436–40. The cramped confines of a bus or the presence of officers between an individual and the bus' exit remained factors to consider "in evaluating whether a passenger's consent is voluntary." *Id.* at 439.

The analysis and holdings from *Delgado* and *Bostick* are applicable in this case. Similar to *Delgado* and *Bostick*, many of the perceived limitations on the defendants' ability to leave were due to "factor[s] independent of police conduct." *See id.* at 436. The defendants were in the car wash bay voluntarily and had chosen to close both garage doors in the bay, which created a more confined area and limited easy egress. The defendants were in the middle of washing a car when officers arrived. Even though they briefly ceased drying the car to talk with the officers, they were generally unhindered from walking around the bay or continuing to work on the car. It is true that Lillich at one point appears to have asked whether he could resume working on the car, which may indicate that a reasonable person in that situation could believe he or she was not at liberty to move about. However, the officer replied that Lillich could continue, and he did.

Additionally, the defendants had not yet completed washing the car, and there is no clear or certain evidence that they would have departed during the approximately seven-minute encounter had the officers not approached them. *Cf. id.* at 435–36 (noting that a person who is approached while his or her bus was temporarily stopped, or right before the bus was scheduled to depart, generally would not desire or feel free to leave the bus even if police were not present, and thus the fact the person may have felt limitations on his or her ability to leave "says nothing about whether or not the police conduct at issue was coercive"). Any delay that was caused to the defendants' work on the car was not unreasonable. Therefore, although asking whether a reasonable person

in the defendants' place would have felt free to leave is important, I find that the more important question here is whether a reasonable person in the defendants' place would have felt free to decline the officers' requests or otherwise terminate the encounter. *See id*

The officers' conduct reveals little evidence that they attempted to compel cooperation. The officers parked their vehicle in front of the bay next to the bay containing Lillich's car. Thus, they did not block an exit the defendants could have used if they attempted to terminate the encounter and drive away. The officers entered the car wash bay through the only door that was open, the door between the two bays, and remained near that door throughout the encounter. Being near enough to the defendants to converse, but not so near as to limit their ability to move throughout the bay, would have been more difficult if the officers had not remained close to the entrance they had used. It is just as likely that they remained near the doorway so that they would not hinder the defendants' movements or to ensure that they could attempt to question them if they tried to leave as it is that they stood by the doorway to prevent the defendants from leaving or to compel cooperation. *See Delgado*, 466 U.S. at 218. Further, neither defendant asked or attempted to leave during the initial encounter, and thus they were never told that they could not leave. The fact that an attempt to leave may have seemed likely to guarantee questioning does not mean that a person could reasonably suspect "that they would be seized or detained in any meaningful way." *Id.* at 219.

The fact that a third officer arrived and remained near the doorway is, on its own, unpersuasive for the same reasons. It was not unreasonable, or unduly coercive in nature, for an officer who arrives later to remain at the only place he or she can effectively observe an encounter from its perimeter. Accordingly, I find that any limitation placed on the defendants' freedom of movement, either by entering the car wash bay or standing in or near the open doorway, to be speculative and minimal, and I give it little weight.

Similarly, the officers' retention of Steffens' license and Lillich's identification card does not persuade me that a reasonable person would not have felt free to leave or

20

would have felt compelled to cooperate in this case. Judge Mahoney found—and the parties do not seem to disagree—that the officers asked to see the defendants' identification without indicating that it was required, and the defendants voluntarily gave their identification cards to the officers upon request. This on its own was not a seizure. *See Vera*, 457 F.3d at 835 ("A request to see identification is not a seizure, 'as long as the police do not convey a message that compliance with their request[ ] is required.'" (alteration in original) (quoting *Bostick*, 501 U.S. at 435)); *see also Richards*, 611 F.3d at 969 (finding that an encounter that included a request for identification was consensual because "a reasonable person in [the defendant's] situation would not have felt compelled to comply with [the officer's] request for identification"). However, the Eighth Circuit has held that "in certain circumstances a consensual encounter may become a seizure if the officer retains the individual's driver's license." *United States v. Jefferson*, 906 F.2d 346, 349 (8th Cir. 1990). This is because someone who is "deprived of their . . . license [is] effectively deprived of the practical ability to terminate the questioning and leave." *United States v. Campbell*, 843 F.2d 1089, 1093 (8th Cir. 1988) (citing *Florida v. Royer*, 460 U.S. 491, 501 (1983)).

In *Jefferson*, two defendants had stopped at an interstate rest area due to poor weather, leaving the rented vehicle they were driving running for warmth. 906 F.2d at 347. Soon thereafter, an Iowa Highway Patrol trooper drove into the rest area, parked behind the defendants' vehicle and then approached the window to make a "welfare check." *Id.* After tapping on the driver's side window to awake the defendants, the trooper asked for identification from both occupants and for the rental agreement for the car. *Id.* He then asked the driver of the car to follow him back to his patrol car, where they sat together in the two front seats. *Id.* After learning that neither defendant had an outstanding warrant, the trooper noticed that the driver was not listed as an authorized driver on the rental agreement for the car, which had been rented by the driver's friend. *Id.* The trooper questioned both defendants and asked to search the car, but the driver refused. *Id.* at 347–48. After the trooper received permission from the rental company

21

to impound the car, he conducted an inventory search and discovered drugs in a suitcase in the trunk. *Id.* at 348.

The Eighth Circuit held that the drugs and the defendants' statements should be suppressed because the encounter was not consensual, and the trooper lacked reasonable suspicion at the time the defendants were seized. *Id.* at 349–51. The court explained that the encounter began as a consensual "safety check" but became a seizure because of the trooper's actions:

> [T]he events that immediately followed th[e] initial questioning—the trooper's request for and retention of Hayden's driver's license, Jefferson's identification card, and the car rental agreement; the trooper's request that Hayden leave the rental car and be seated in the patrol car; and the trooper's act of sitting next to Hayden in the front seat of the patrol car—transformed what may have been a consensual exchange into a situation in which "a reasonable person would have believed that he was not free to leave." These combined actions by the trooper went well beyond what an average citizen would expect from a vehicle "safety check."

*Id.* at 350 (citations omitted) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988)). Thus, the trooper's decision to retain the defendant's license and rental papers played a large role in finding that a seizure occurred. *See id.*

In contrast, the Eighth Circuit has also held that an encounter was consensual even though an officer requested and retained the defendant's license and rental car agreement for four to five minutes. *United States v. Carpenter*, 462 F.3d 981, 985 (8th Cir. 2006). The court explained that the request for identification and the rental agreement was not a seizure because the officer did not convey that the defendant must comply with the request. *Id.* Further, the court noted that "when a passenger voluntarily hands identification to an officer, the officer may reasonably consider that voluntary act as consent to a brief retention of the document for purposes of a" records check. *Id.* (citing *United States v. Slater*, 411 F.3d 1003, 1006 (8th Cir. 2005) (holding that the defendant consented to a "routine, thirty-second computerized records check, using equipment readily at hand" by voluntarily giving officer identification card while stopped at a

22

sobriety checkpoint)). The court found that the four-to-five-minute retention of the driver's license was not inconsistent with the type of brief examination the defendant consented to by voluntarily turning over identification. *Id.* Thus, the search was consensual until the officer performed additional actions, such as asking the defendant to exit his vehicle, patting him down, and telling him that a drug dog would be called if he did not consent to a search. *Id.* at 985–86.

More recently, the Eighth Circuit held that an encounter was consensual when an officer approached the defendant, asked him for documentation and retained his license for 15 minutes while conducting a records check. *Oglesby v. Lesan*, 929 F.3d 526, 533 (8th Cir. 2019). The court noted that the officer had asked Oglesby to "wait here" while she performed the records check, and Oglesby never objected to turning over his license. *Id.* However, when Oglesby eventually asked if he was free to leave, the officer told him that he was. *Id.* The court explained that the officer's comment—saying "wait here"—was just one factor in considering whether Oglesby was seized and, even when combined with the fact the officer retained the defendant's license for 15 minutes, it was insufficient to find that a seizure occurred. *Id.* On the whole, the court found that the officer did not "ma[k]e any show of force or authority" to cause the consensual encounter to become a seizure. *Id.* The court explained that the officer "was alone and did not activate her patrol car's lights or siren, brandish her firearm, physically block Oglesby's departure, . . . make physical contact with Oglesby[,] . . . threaten Oglesby with arrest or tell him he was the focus of an investigation." *Id.*

Although there are elements from each of these cases that are relevant here, on the whole I find that this case is more similar to *Carpenter*, *Slater* and *Oglesby* than to *Jefferson*. Unlike *Jefferson*, the officers here did not ask either defendant to leave their present location or sit with and question either defendant alone in a police vehicle. *See Jefferson*, 906 F.2d at 350. Without these additional actions, it is unlikely the *Jefferson* court would have found asking for and retaining identification sufficient on its own to indicate a seizure occurred. *See id.* In contrast, like in *Carpenter*, the defendants gave

23

their identification to the officers voluntarily, and thus gave consent to reasonable verification and record checking procedures. *See Carpenter*, 462 F.3d at 985. The fact that this retention lasted a total of seven minutes—four minutes in the presence of the defendants and three minutes at the officer's vehicle—was not unreasonable or inconsistent with the officers' purpose for the encounter or requesting identification. The record also lacks the types of actions that the *Carpenter* court found transformed the encounter to a seizure, such as requesting the defendant to leave his current location, conducting a pat down or compelling consent to a search. *See id.*

Further, like in *Oglesby*, the officers here did not activate their patrol car's lights or siren, brandish a firearm, make physical contact or threaten arrest. *See Oglesby*, 929 F.3d at 533. The fact that the defendants continued to dry off the car while Deputy Lenz retained their identification, and after the initial encounter ended, also indicates that the retention of the identification itself most likely did not prevent the defendants from leaving. All this weighs against finding that the officers made a show of force or authority sufficient to compel compliance with their request for identification or cause the defendants to not feel free to leave. *See id.* Thus, I give the retention of the defendants' identification little weight.

Other factors, such as the presence of three officers and the officers' being visibly armed, weigh in favor of finding that the encounter was a seizure. *See Villa-Gonzalez*, 623 F.3d at 533 (noting that the presence of three officers, two of which were visibly armed, weighed in favor of finding that encounter was a seizure). However, without more, these do not warrant finding a seizure in this case. *See id.* (noting that whether an officer is visibly armed should not be given "a great deal of weight"); *United States v. White*, 81 F.3d 775, 779 (8th Cir. 1996) (explaining that encounter did not lose its consensual nature due to the presence of three officers because the record showed that two of the officers, similar to this case, "were little more than passive observers prior to commencement of the search"); *United States v. Archer*, 840 F.2d 567, 572 (8th Cir. 1988) (finding that an encounter was consensual even when three officers were present

because there was no evidence that any of the "officers used force, threats of force, or other coercive means to obtain [the defendant's] cooperation").

On the other hand, there are many factors, including the majority of those typically evaluated under Eighth Circuit case law, that weigh in favor of finding that the encounter was consensual. The officers did not physically touch the defendants, brandish weapons, turn on their patrol cars' lights or siren, speak in a tone that indicated compliance is necessary, accuse defendants of specific offenses or threaten arrest. As discussed above, the officers also did not unreasonably limit the defendants' freedom of movement or unreasonably retain their identification. Accordingly, based on my de novo review, I find that in light of the totality of the circumstances, the initial encounter between law enforcement officers and the defendants was consensual. Therefore, the Government's first objection to the R&R is sustained.

Even if the initial encounter was not consensual, I agree with Judge Mahoney that no Fourth Amendment violation occurred because the initial encounter was conducted out of reasonable suspicion. Under *Terry*, an officer may briefly detain an individual if the officer has reasonable suspicion that "criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30 (1968). To have reasonable suspicion, a police officer must be "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21. Whether law enforcement had reasonable suspicion to conduct a *Terry* stop is "based on 'the totality of the circumstances, in light of the officer's experience.'" *United States v. Polite*, 910 F.3d 384, 387 (8th Cir. 2018) (quoting *United States v. Stigler*, 574 F.3d 1008, 1010 (8th Cir. 2009)). Accordingly, "[o]bservations of the officers are considered 'as a whole, rather than as discrete and disconnected occurrences.'" *United States v. Kent*, 531 F.3d 642, 648 (8th Cir. 2008) (quoting *United States v. Poitier*, 818 F.2d 679, 683 (8th Cir. 1987)).

In this case, I find that the totality of the circumstances, viewed in the eyes of trained law enforcement, gave rise to a reasonable suspicion sufficient to justify an investigatory stop. The time of day, location of the defendants at a car wash, and law

enforcement's knowledge of recent burglaries in Sloan and nearby towns were all valid considerations in forming reasonable suspicion. *See United States v. Collins*, 883 F.3d 1029, 1032 (8th Cir. 2018) (quoting *United States v. Quinn*, 812 F.3d 694, 697–98 (8th Cir. 2016)) ("Factors that may reasonably lead an experienced officer to investigate include time of day or night, [and] location of the suspect parties . . . ."); *United States v. Bailey*, 417 F.3d 873, 877 (8th Cir. 2005) (noting that an "attempted armed carjacking at an adjacent gas station a few days before" was a relevant factor in finding that an officer had reasonable suspicion).

Lillich and Steffens argue that using the car wash at 3:00 A.M. with both doors down should not be considered sufficiently "suspicious" to contribute to reasonable suspicion, because it was a 24-hour car wash and closing both doors is not uncommon during winter months. Lillich argues that Deputy Lenz lacked sufficient knowledge about the crimes in surrounding areas and the break-ins in Sloan from the night before to form reasonable suspicion from them. Lillich also attacks Lenz's credibility, stating that Lenz misinterpreted or exaggerated Steffens' supposed "lookout" activity.

For the most part, I find these arguments unpersuasive. Lillich's attack on each of these factors in isolation is the exact type "of divide-and-conquer analysis" that "[t]he totality-of-the-circumstances test precludes." *Id.* (internal quotation marks omitted) (quoting *Quinn*, 812 F.3d at 697–98). I agree with Lillich and Steffens that using a 24-hour business at any time of night is not suspicious per se and that Lenz's perceptions regarding Steffens' lookout activities are partially disproved by the evidence. However, that it is uncommon for someone to wash his or her vehicle at 3:00 A.M. is the type of "commonsense" and "practical consideration[] of everyday life" that is appropriate for an officer to consider in forming reasonable suspicion. *See United States v. Dillard*, 825 F.3d 472, 475 (8th Cir. 2016) (quoting *Ornelas v. United States*, 517 U.S. 690, 695–96 (1996)); *see also United States v. Hayden*, 759 F.3d 842, 847 (8th Cir. 2014) (finding that officers had reasonable suspicion in part because "the officers knew from experience that it was unusual to find people on the street after dark" in that area). Further, although

Lenz did not know extensive details about the recent crimes in Sloan and surrounding areas, this does not change the fact that he had some knowledge of them and obtained that knowledge through law enforcement channels. *See* Doc. No. 89 at 19–22. It was not unreasonable for the officers to have heightened suspicion due to the knowledge of recent crimes in the area. *See United States v. Dawdy*, 46 F.3d 1427, 1430 (8th Cir. 1995) (noting that knowledge of "previous burglary alarms" in the area defendants were located at an unusual hour contributed to finding of reasonable suspicion); *see also Bailey*, 417 F.3d at 877 (noting that knowledge of frequent crimes in the area contributed to finding reasonable suspicion).

In short, when all the factors rousing suspicion are viewed as a whole, rather than discrete and disconnected occurrences, the officers had reasonable suspicion in this case. This remains true even if none of these factors, on their own, would have justified a stop. *Quinn*, 812 F.3d at 698 ("An officer may have reasonable suspicion to conduct a Terry stop based on a combination of factors even where no single factor, considered alone, would justify a stop."). Therefore, even if the initial encounter was not consensual, I adopt Judge Mahoney's finding of reasonable suspicion for that encounter and overrule Lillich's and Steffens' objections to the R&R on that point.

I also agree with Judge Mahoney that reasonable suspicion did not dissipate at the moment the officers entered the car wash bay but did not discover evidence of burglary. As discussed above, and noted by Judge Mahoney, asking questions and identifying individuals "are a routine and accepted part of many *Terry* stops." *See Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177, 186 (2004); *see also United States v. Esquivias*, 416 F.3d 959, 701–02 (8th Cir. 2005) (noting that "it was reasonable for the officers to ask 'a moderate number of questions to determine [the defendant's] identity *and* try to obtain information confirming or dispelling the officer's suspicions.'" (quoting *United States v. Rodriguez–Arreola*, 270 F.3d 611, 617 (8th Cir. 2001)).

Lillich and Steffens argue that any reasonable suspicion dissipated at the moment the officers did not discover evidence of burglary and that all subsequent actions

27

unconstitutionally prolonged the encounter. This argument is not persuasive. The officers' actions during the initial encounter were all reasonable actions as part of one continuous encounter and were not unreasonable in length. The fact that one suspicion may be disproved is merely one factor to consider in determining the appropriate scope of an investigatory stop or whether reasonable suspicion continues. *Cf. United States v. Lakoskey*, 462 F.3d 965, 976–77 (8th Cir. 2006), *as amended on reh'g* (Oct. 31, 2006) (noting that a negative dog sniff, on its own, does not dissipate reasonable suspicion that is based on factors that are unchanged by the results of the dog sniff).

In this case, the officers believed that a burglary may be taking place at the car wash, but this was a hypothesis deduced from factors that created reasonable suspicion, not the source of reasonable suspicion. The fact that they did not discover evidence of burglary did nothing to change or refute the fact that the defendants were at the car wash at an unusual hour, that Lenz believed that Steffens' actions appeared suspicious, or that the officers were in the area due to recent reports of crime. Therefore, the reasonable suspicion that was justified by these facts did not dissipate when evidence of burglary was not discovered. *Cf. id.* at 977 (holding that reasonable suspicion did not dissipate when "[t]he factors giving rise to reasonable suspicion in the first place remained unchanged by the positive or negative results of" a dog sniff for drugs).

In short, I find no Fourth Amendment violation occurred during the defendants' first encounter with the officers. The initial encounter was consensual, and thus the Government's first objection is sustained. Even if it was not consensual, it was supported by reasonable suspicion that did not dissipate before the conclusion of the encounter. Accordingly, Lillich's objections and Steffens' objection as to the initial encounter are overruled.

## C.     *Legality of the Second Encounter*
### 1.     *Judge Mahoney's Analysis*

To determine whether any Fourth Amendment violations occurred during Steffens' and Lillich's second encounter with law enforcement, Judge Mahoney began by analyzing the validity of their detention after the officers were notified of a potential federal arrest warrant for Steffens. *Id.* at 16. Judge Mahoney stated that "[t]he officers could reasonably detain Steffens while they confirmed the existence of an outstanding warrant," a point that Steffens does not seem to challenge. *Id.* at 16 & n.8 (citing *United States v. Simmons*, 172 F.3d 775, 779 (11th Cir. 1999); *United States v. Tuley*, 161 F.3d 513, 515 (8th 1998)).

In contrast, Judge Mahoney concluded that the existence of a potential warrant for Steffens did not justify further detention of Lillich. *Id.* at 16–17. The officers lacked reasonable suspicion "in the interim between the conclusion of the initial stop and before finding drugs on Steffens's person." *Id.* at 16–17, 19. Thus, Lillich's detention from the moment he requested to leave until the drugs were found on Steffens' person was an unlawful seizure. *Id.* In consequence, Judge Mahoney recommends suppressing all statements Lillich made to officers after he asked to leave:

> Lillich could have left the car wash bay on foot . . . if he had been permitted to leave prior to the discovery of drugs on Steffens's person— indeed, Lillich later asked the officers if he could walk back to the casino to try to find someone there to give him a ride.
>
> . . . .
>
> A preponderance of the evidence does not establish a "reasonable probability" that in the absence of Lillich's unlawful detainment, he would have remained at the car wash bay and continued to speak to the officers. Moreover, it is not clear that Deputy Simoni and the reserve deputy would have tried to track down Lillich once drugs were found on Steffens—Deputy Simoni told Lillich to "start calling" someone for a ride upon Steffens's arrest, and it appears that he would have allowed Lillich to access his vehicle, suggesting he would not have immediately chased after Lillich if he had left a minute earlier. And although Sergeant Lenz ultimately stopped Lillich from obtaining his phone from the car, he was preoccupied with arresting Steffens, so neither is it likely that he would have tried to stop Lillich right away. A preponderance of the evidence does not establish that

the officers would have stopped Lillich and continued to detain him if he had been able to leave the scene when asked.

*Id.* at 18–19.

Despite finding a temporary unlawful seizure, Judge Mahoney's narrowing of Lillich's unlawful seizure to the brief time between his request to leave and the discovery of drugs on Steffens' person was important to her ultimate conclusion that the inevitable discovery doctrine saves the other evidence discovered during the encounter from suppression. *Id.* at 17–19. After describing the inevitable discovery test, Judge Mahoney applied it to this case:

> Almost immediately after Lillich requested to leave, the officers conducted a pat-down search of Steffens's person and discovered methamphetamine. The discovery of methamphetamine on Steffens's person, combined with the other facts known to the officers (including Steffens's "lookout" behavior earlier and the possible outstanding federal arrest warrant related to drug trafficking for Steffens), gave the officers reasonable, articulable suspicion to detain Lillich and his vehicle, which Steffens had been driving, until a K-9 officer could come to the scene and conduct a drug dog sniff of the vehicle. Because Lillich did not have a driver's license, he could not have left with the car prior to the discovery of the drugs on Steffens's person, even if he had been permitted to leave—he would have had to call someone to give him a ride, and that person would not have arrived within the short time that the officers developed reasonable suspicion to detain the car for a drug dog sniff. Discovery of the drugs in the car was thus inevitable.
>
> . . . . [Furthermore,] Lillich did not have his phone on his person—it was in the car, and later, officers had a difficult time finding it on Lillich's behalf, despite Lillich telling them where he believed the phone was located. Given that Sergeant Lenz discovered drugs on Steffens's person within a minute of Lillich asking whether he was free to leave . . . , I do not find that Lillich could have left the car wash bay with his phone prior to the discovery of drugs on Steffens's person. Thus, I find that the inevitable discovery doctrine also bars suppression of the evidence from Lillich's phone.

*Id.* at 18–19 (citations omitted).

## 2.     *The Government's Objection*

In its second objection, the Government argues that the officers had reasonable suspicion to detain Lillich at the time he requested to leave.  *Id.* at 3.  To support this assertion, the Government claims the following:

a.  Defendants were in a car wash at an unusual time.
b.  Defendant Lillich was known to be a drug offender.
c.  Defendant Steffens, who was driving Lillich's vehicle, was known to have a warrant for dangerous drugs.
d.  Defendants were known to have come from WinnaVegas casino, an area known by officers to have significant drug trafficking on a nearly daily basis.
e.  Officers knew that Lillich had purchased the car that was being washed from a known criminal and drug offender, and that the car was not registered to Lillich.

*Id.* The Government argues that these facts, among others, justify Lillich's detention at the time he asked to leave.  *Id.*

## 3.     *Lillich's Objections*

Of Lillich's 13 objections, five relate to the second encounter with the officers.  In his sixth objection, Lillich objects to Judge Mahoney's finding that he could not have left the car wash with his phone before the discovery of drugs on Steffens' person.  *Id.* at 5. Lillich agrees that he could have left but for the officers' preventing him, but he contends that it was the officers' actions that prevented him from being able to leave with his phone because (1) he was not allowed to get it himself and (2) the officers deliberately did not find his phone when permitted to search for it in order to further detain Lillich.  *Id.*

In his eighth objection, Lillich argues that Judge Mahoney should have recommended the suppression of a receipt that was found on the floor of the car wash bay.  *Id.* at 5–6.  After officers found drugs on Steffens, Lillich was patted down and no drugs or contraband were found.  However, for some unknown reason a receipt that had been among Lillich's personal effects failed to be returned to his pocket and ended up on the ground.  *Id.* at 5 n.6.  Lillich argues that the receipt should be suppressed because it

31

was obtained after a time that Lillich was unlawfully detained. *Id.* at 5. Similar to Judge Mahoney's conclusion that had Lillich been allowed to leave, officers most likely would not have obtained any of his statements made after his request, Lillich argues that had he been permitted to leave all his possessions on his person, including the receipt, would also have been unobtainable. *Id.* at 5–6.

For his ninth objection, Lillich argues that the drugs found on Steffens, Steffens' potential warrant, and the other facts known to the officers did not justify the continued detention of Lillich and his vehicle. *Id.* at 6. In arguing this point, Lillich states that at the time of the search, the officers had no evidence that Steffens and Lillich had been in the vehicle together or that Steffens had been driving the car. *Id.* He also argues that the potential existence of a warrant for Steffens, which was for a federal probation violation, did not sufficiently relate to Lillich's car, which the officers could not be sure had any connection to Steffens. *Id.*

In his tenth objection, Lillich argues that the only reason he could not leave with his car from the time he requested to leave until drugs were found on Steffens is because the officers' actions prevented him from being able to do so. *Id.* at 7. He argues that "more likely than not" he could have used his cell phone to call someone during that time if officers had allowed him to retrieve it, and there is no way to know whether he could have arranged to have someone get there quickly enough to drive him elsewhere. *Id.* Lillich concludes that the evidence from the vehicle should be suppressed because it was the officers' actions that denied Lillich the opportunity to attempt to call for and obtain a driver. *Id.*

In his eleventh objection, the final objection to this portion of the R&R, Lillich argues that Judge Mahoney applied the inevitable discovery doctrine incorrectly. *Id.* at 8.

### 4. Analysis

Shortly after the initial encounter between the defendants and law enforcement ended, the officers were notified that Steffens potentially had a federal warrant related to drugs. The officers returned and reinitiated contact with the defendants. The first contested issues regarding the second encounter are whether, and when, the officers had reasonable suspicion to detain Lillich, Steffens and Lillich's car throughout the encounter.

The detention, and eventual arrest, of Steffens did not violate the Fourth Amendment. The potential outstanding warrant for Steffens added to the officers' prior reasonable suspicion and appropriately led them to reinitiate contact. *See United States v. Linkous*, 285 F.3d 716, 720 (8th Cir. 2002) (noting that an officer's reasonable suspicion may evolve or grow "as the circumstances unfold and more suspicious facts are uncovered."); *see also United States v. Cortez*, 449 U.S. 411, 417 n. 2 (1981) ("[A]n officer may stop and question a person if there are reasonable grounds to believe that person is wanted for past criminal conduct."). The discovery of a potential outstanding warrant justified detaining Steffens until the officers could confirm the existence of the warrant. *See United States v. Payne*, 534 F.3d 948, 950, 952 (8th Cir. 2008) (noting that there was reasonable suspicion to prolong a stop when the officer assumed, from a "hit" in a law enforcement database, that defendant had an outstanding warrant and learned from dispatch that defendant was known to be armed and dangerous); *United States v. Tuley*, 161 F.3d 513, 515 (8th Cir. 1998) (concluding that detention that lasted for 20 minutes while an outstanding warrant was verified did not violate Fourth Amendment even though officers initially stopped defendant due to the defendant's presence at a gas station in the middle of the night in an area where gas station robberies had recently occurred).

The officers were also justified in conducting a pat-down search of Steffens, because they received information that Steffens' warrant was related to drugs and there is a tendency among drug criminals to possess firearms. *United States v. Woodall*, 938 F.2d 834, 837 (8th Cir. 1991) (noting that officer's discovery that person who was

33

stopped had connection to drugs justified a pat-down search for weapons); *cf. United States v. Peroceski*, 520 F.3d 886, 889 (8th Cir. 2008*)* (acknowledging the "well-known tendency of drug criminals to use firearms in connection with their drug activities" to support the finding "that a gun near the vicinity of drug activity is somehow connected to it"). After finding methamphetamine in Steffens' pocket, the officers placed him under arrest. Steffens has not challenged these findings.

In contrast, whether Lillich's detention during the second encounter violated the Fourth Amendment is not as clear. In order to detain Lillich, the officers needed to have reasonable suspicion at least by the moment Lillich asked to leave. The first potential reason the officers could have detained Lillich is because he was a passenger who was with and dependent on Steffens, his driver that night, who was lawfully detained.

Officers have some ability to detain and question passengers when the driver has been stopped lawfully. There is little doubt that seizing the driver of a vehicle generally seizes all the passengers of that vehicle as well. *See Arizona v. Johnson*, 555 U.S. 323, 327 (2009). Officers are then permitted to ask passengers to exit the vehicle, ask for identification or even conduct a pat-down search if warranted by the circumstances. *See Maryland v. Wilson*, 519 U.S. 408, 414 (1997) (holding that passengers in a vehicle that is lawfully stopped may legally be asked to exit the vehicle); *United States v. Roberts*, 687 F.3d 1096, 1099 (8th Cir. 2012) (explaining that officers may conduct routine tasks such as warrant status or criminal history checks). The Eighth Circuit has held that a passenger may lawfully be ordered to remain in a vehicle if the officer has reasonable safety concerns. *See United States v. Sanders*, 510 F.3d 788, 790 (8th Cir. 2007) (holding "that [the officer] did not violate the Fourth Amendment when he ordered [the defendant] to reenter the car" that was stopped). Other circuits have also found that officers have the ability to detain or control the movement of passengers or associates of those who are being investigated for criminal activity, even if the officer has no immediate suspicion that the passenger or associate is involved in the criminal activity. *See United States v. Clark*, 337 F.3d 1282, 1288 (11th Cir. 2003) (finding no Fourth Amendment

34

violation when officer, who discovered two men fighting in the road next to a car, ordered an individual—who had been a passenger with the two men and was standing on the sidewalk, observing them fight—to get into and remain in the car); *United States v. Moorefield*, 111 F.3d 10, 13 (3d Cir. 1997) (finding no Fourth Amendment violation when passenger, who had attempted to exit car, was ordered to remain in vehicle with his hands up in the air at all times).

This situation is different. I find that the officers could not have lawfully detained Lillich merely due to his status as a passenger whose driver was lawfully detained. Many of the reasons for allowing officers to detain passengers—such as identification, warrant, and criminal history checks—had already been performed regarding Lillich during the first encounter. The only action the officers had not yet performed was a pat-down search, but there were insufficient grounds to pat-down Lillich before he asked to leave. *Cf. Vanella v. United States*, 371 F.2d 50, 52–54 (9th Cir. 1966) (finding that warrantless search of a subject was not justified even though the police had a warrant for the arrest of the companion he was visiting). Further, although the circumstances of this case are somewhat analogous to a traditional traffic stop, the differences from a traditional traffic stop must be given proper weight. The parties were stopped while with a car, not while driving it, and had already had a seven-minute encounter with the officers. Thus, the second encounter lacked the type or extent of danger that normally exists in a traffic stop. *See Wilson*, 519 U.S. at 413 (noting that "traffic stops may be dangerous encounters" and citing statistics of harm to officers during traffic stops); *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977) (recognizing "the inordinate risk confronting an officer as he approaches a person seated in an automobile").

The circumstances here are also akin to approaching two individuals in public, where there is less reason to detain the companion of one who is detained once that companion has been identified and no outstanding warrants or further evidence of criminal conduct is discovered. *See Gainor v. Rogers*, 973 F.2d 1379, 1382 (8th Cir. 1992) (noting that companion of the detained defendant was allowed to leave after

35

producing identification); *see also United States v. Magers*, 123 F. App'x 344, 345–46 (10th Cir. 2005) (finding that officers told driver he was allowed to leave once he had been identified and no outstanding warrants were found, even though his passengers were detained).

The second potential reason the officers could have detained Lillich is that they had reasonable suspicion that Lillich was presently involved in criminal activity. The Government makes this argument in its second objection. Specifically, the Government asserts that the officers' knowledge of a potential outstanding warrant for Steffens, and the knowledge obtained at the beginning of the second encounter that Lillich bought his car from known criminal, added to their prior reasonable suspicion and justified Lillich's continued detention. Lillich argues that a potential outstanding warrant for Steffens did not provide reasonable suspicion for officers to lawfully detain him.

Based on my de novo review, I agree with Judge Mahoney, and Lillich, that the officers lacked reasonable suspicion to detain Lillich at the time he asked to leave. The original grounds of reasonable suspicion justified the initial encounter even if it had not been consensual, but the officers then completed their initial investigatory encounter with Lillich and Steffens. While the reasonable suspicion arising from those original factors did not entirely dissipate at the time the officers concluded the initial encounter, it lessened as the initial encounter proceeded and eventually became insufficient to further detain the defendants. The knowledge that Steffens potentially had an outstanding warrant—which was unrelated to Lillich and the officers' original suspicions—and that Lillich bought his car from a person known to be involved in criminal activity did not sufficiently renew or add to the officers' reasonable suspicion to detain Lillich. *See Magers*, 123 F. App'x at 345–47 (driver was allowed to leave once identified, even though one of his passengers had outstanding warrants).

Considering the totality of the circumstances, the officers did not have reasonable suspicion to detain Lillich at the moment he asked to leave. Lillich continued to cooperate with the officers as they renewed contact with the defendants, but he should have been

36

permitted to leave when he requested to do so. Because Lillich should have been permitted to leave and could have left on foot in the moments between his request to leave and when drugs were discovered in Steffens' pocket, I agree with Judge Mahoney that all statements made by Lillich after he requested to leave should be suppressed.

The next contested issue is the detention of Lillich's vehicle. At the moment Steffens was detained due to his potential outstanding warrant, the vehicle was only incidentally "detained" because Lillich could not drive the vehicle himself. Judge Mahoney found that detaining Lillich's car for a drug dog sniff became appropriate at the moment drugs were discovered on Steffens' person.

I agree with Judge Mahoney that the officers had reasonable suspicion to detain Lillich's vehicle for a drug-dog sniff. Officers may detain a vehicle if they have reasonable suspicion that it is carrying contraband, even if it is unrelated to the original reasons for an investigatory stop or encounter. *See United States v. Woods*, 829 F.3d 675, 679 (8th Cir. 2016); *United States v. White*, 42 F.3d 457, 460 (8th Cir. 1994). The drugs found on Steffens, combined with his potential outstanding warrant for "dangerous drugs" and the factors that led to the initial encounter, created reasonable suspicion that Lillich's vehicle might contain further evidence of drugs or drug-related crimes. Although Steffens did not own the vehicle, he was the driver. Based on the record before me, I find no evidence that contradicts Deputy Lenz's testimony at the suppression hearing that the defendants identified Steffens as the driver or that the officers were told the warrant related to dangerous drugs. *See* Doc. No. 89 at 38, 40–41.

The fact that Steffens was the driver provides a nexus between him and Lillich's vehicle, because in most cases drivers exercise sufficient dominion and control over a vehicle to warrant further searches for drugs or guns. *Cf. United States v. Haire*, 353 F. App'x 72, 73 (8th Cir. 2009) (finding that although the defendant "did not live at the residence, he was present at the time of the search and exercised sufficient authority and dominion over the home to conceal drugs there"); *Ortega v. United States*, 270 F.3d 540, 546 (8th Cir. 2001) (noting that although being a passenger in a car does not show control

37

or knowledge of drugs, being the driver of a car containing drugs showed sufficient control of the car to show that defendant constructively possessed the drugs); *United States v. Willis*, 89 F.3d 1371, 1377 (8th Cir. 1996) (same).

Judge Mahoney concluded that although Lillich, hypothetically, could have left with the vehicle between the time he asked to leave and the moment drugs were discovered in Steffens' pocket, he was factually unable to do so. He could not drive the car himself, due to his lack of a driver's license, and the time interval (roughly one minute) was simply too short for Lillich to make arrangements for someone to pick him up and take him away from the car wash. Judge Mahoney found that the same holds true for Lillich's phone. Although Lillich could have left on foot before the drugs were found in Steffens' pocket, Judge Mahoney found that he would not have been able to do so with his phone in the short amount of time before the drugs were found. As such, Judge Mahoney found that the inevitable discovery doctrine applied to the drugs in the vehicle and Lillich's phone. I agree.

As explained above, because Steffens was the driver of Lillich's vehicle, there was a sufficient connection between Steffens and the vehicle for the officers to form reasonable suspicion that the vehicle may contain further evidence of drug-related activity and detain it for a drug-dog sniff. If Lillich had been told that he could leave, he could not have done so in the vehicle, nor could he have done so with his phone, which was in the vehicle, during the very short interval before the drugs were found on Steffens and reasonable suspicion regarding the vehicle arose. Even if Lillich had been permitted to leave on foot, the basis for detaining the vehicle to await a drug-dog sniff was connected to Steffens, not Lillich. Thus, regardless of whether Lillich was in the car wash bay or had been permitted to leave, the drugs in the vehicle and Lillich's phone would have inevitably been found.

In summary, Lillich was illegally detained when the officers did not allow him to leave upon his request because they lacked reasonable suspicion to detain him. Therefore, the Government's second objection is overruled. However, due to the timing

38

of the events, Lillich could not have left with his vehicle or his phone (which was in the vehicle) before reasonable suspicion arose to detain the vehicle for a drug-dog sniff. Therefore, Lillich's sixth objection is overruled. Because Steffens was the driver, officers had reasonable suspicion to detain the vehicle based on the drugs found on Steffens, the potential drug-related federal warrant for Steffens, and other facts discussed above. Therefore, Lillich's ninth and tenth objections are overruled. Because Lillich could not have departed with his car before officers had reasonable suspicion to detain it, the drugs therein would inevitably have been discovered, regardless of whether Lillich had been allowed to leave on foot. Therefore, Lillich's eleventh objection is overruled.

Finally, in his eighth objection Lillich seeks suppression of a receipt that officers found on the floor of the car wash bay. Doc. No. 85 at 5–6. Judge Mahoney did not address this issue in the R&R, and the Government has not briefed it. The only mention of the receipt comes from one short exchange during the suppression hearing. Doc. No. 89 at 55. Lillich argues that the receipt was in his possession but, after he was searched, ended up on the ground without his knowledge. Doc. No. 85 at 5–6. He argues that had he been permitted to leave when he asked, the receipt would have remained in his possession and not been obtained by the officers. *Id.* Although I understand the logic of Lillich's argument, the record is insufficiently developed to make a finding on this issue. The record reveals only that Deputy Lenz found a receipt for Ziploc bags. Doc. No. 89 at 55. There is no evidence, other than Lillich's assertions in his objections, that speaks to whether the receipt was on the ground before or after Lillich requested to leave, an important fact in determining whether suppression is appropriate. Further, the fact that Lillich raises this argument for the first time in his objections to the R&R weighs against Lillich. *Cf. United States v. Chavez Loya*, 528 F.3d 546, 555 (8th Cir. 2008) (finding that court did not abuse its discretion by declining to address argument that was made for the first time on party's motion to reopen objections to an R&R). Therefore, Lillich's eighth objection is overruled.

Accordingly, and in accordance with the R&R, all of Lillich's statements made after his request to leave are suppressed. However, the motion to suppress will be denied as to evidence of the drugs found in the vehicle and evidence from Lillich's phone.

### D. Lillich's Motion to Suppress Due to Lack of Miranda Warnings

#### 1. Judge Mahoney's Analysis

Judge Mahoney found that "the lack of *Miranda* warnings would not require Lillich's statements to be suppressed" in this case. Doc. No. 75 at 20. Judge Mahoney explained:

> Although a person detained during a *Terry* stop "is not free to leave . . . until the completion of a reasonably brief investigation, which may include limited questioning," such stops do not usually render the detainee "in custody" for purposes of *Miranda*. The relevant inquiry is whether the suspect's "freedom of action is curtailed to a 'degree associated with formal arrest.'"

> At first, officers told Lillich he was not free to leave while they confirmed whether Steffens had a warrant. Later, officers explicitly said that although he was being detained while they waited for the arrival of a K-9 officer, he was not under arrest. Lillich was not handcuffed. Officers permitted him to smoke, but he was not allowed to leave the car wash bay and smoke outside when he first asked. After officers discovered drugs on Steffens, Lillich was not permitted to access his car (although officers offered to retrieve items on his behalf). I do not find that Lillich's detention amounted to a formal arrest, and *Miranda* warnings were thus not required.

*Id.* (citations omitted).

#### 2. Lillich's Objection

In his twelfth objection, Lillich argues that the totality of the circumstances demonstrate that his freedom of action was curtailed to an extent that he was under arrest for purposes of *Miranda*. Doc. No. 85 at 8–9. He argues that by standing in the only open doorway, taking identification cards, and not permitting him to enter his car,

40

officers sufficiently curtailed Lillich's ability to leave to warrant a *Miranda* warning. *Id.* Lillich notes that Judge Mahoney found that the stop was a *Terry* stop because a reasonable person would not feel free to leave, and he contends that this conclusion is sufficient to invoke *Miranda*'s requirements as well. *Id.*

### 3. Analysis

Miranda warnings are required for custodial interrogations. *See United States v. Black Bear*, 422 F.3d 658, 661 (8th Cir. 2005). "The ultimate question in determining whether a person is in 'custody' for purposes of *Miranda* is 'whether there is a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.'" *United States v. Giboney*, 863 F.3d 1022, 1027 (8th Cir. 2017) (quoting *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004)). "Interrogation includes not only express questioning by an officer, but also any words or actions that 'police should know are reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Ochoa-Gonzalez*, 598 F.3d 1033, 1038 (8th Cir. 2010) (quoting *Holman v. Kemna*, 212 F.3d 413, 417 (8th Cir. 2000)). The Eighth Circuit has recognized that "a *Terry* stop . . . allows an officer with reasonable suspicion to detain an individual in order to ask 'a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions.'" *United States v. Rodriguez-Arreola*, 270 F.3d 611, 617 (8th Cir. 2001) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984)). "A request for routine information necessary for basic identification purposes is not interrogation under *Miranda*, even if the information turns out to be incriminating." *United States v. McLaughlin*, 777 F.2d 388, 391 (8th Cir. 1985). *Miranda* warnings are not needed for persons detained for a *Terry* stop. *United States v. Pelayo-Ruelas*, 345 F.3d 589, 592 (8th Cir. 2003).

Based on my de novo review, I agree with Judge Mahoney that the officers' failure to provide Lillich with *Miranda* warnings in this case does not warrant suppression. As discussed above, even if the first encounter was not consensual, the officers' actions were supported by reasonable suspicion as a *Terry* stop. I disagree with Lillich's argument

that finding that a *Terry* stop occurred indicates that *Miranda* warnings were required. Although, by definition, a *Terry* stop means that a person had a reasonable belief that he or she was not free to leave, the belief that one is not free to leave does not equate to a formal arrest per se. I have already found that Lillich's movement during the initial encounter was not so limited as to be deemed a *Terry* stop, let alone a formal arrest. Even during the second encounter, I do not find that his freedom of movement was limited to a degree associated with formal arrest. Lillich was not handcuffed. The officers allowed him to continue washing his car as they spoke with him and processed his identification. He was told that he was being detained but wasn't under arrest. The encounters were not unreasonable in length and the officers did not employ unreasonable force or threat of force.

The officers did prevent Lillich from accessing his vehicle once drugs were found in Steffens' pocket, which created a partial limitation on his freedom of movement. However, the limitation was not unreasonable and did not amount to the type of limitation associated with formal arrest. Therefore, Lillich was not in custody and the lack of *Miranda* warnings does not warrant suppression. However, because I have already found that statements Lillich made during the second encounter after he asked to leave should be suppressed, a *Miranda* violation is not needed to exclude those statements.

### E.    *Steffens' Arguments to Suppress Evidence from His Cell Phone*

In addition to challenging the evidence from his encounters with law enforcement, Steffens also seeks to suppress the evidence obtained from his cell phone. Doc. No. 50. He argues that the search warrant for the phone was not supported by probable cause because there was not a sufficient nexus connecting his phone to a criminal activity. Doc. No. 50-1 at 6–7. He also argues that the warrant was invalid under *Franks v. Delaware*, 438 U.S. 154 (1978), because its affidavit contained false statements that were made intentionally and knowingly or with a reckless disregard of the truth. *Id.* at 9–10.

### 1.    *Judge Mahoney's Analysis*

Judge Mahoney recommends denying Steffens' motion regarding the warrant on both points.   Doc. No. 75 at 25, 30.   Judge Mahoney found that the warrant was supported by probable cause because the affidavit accompanying the warrant to search Steffens' phone "established a 'fair probability' that evidence of drug trafficking would be found on [his] cell phone."  *Id.* at 22.  Judge Mahoney then identified three facts from the affidavit that establish the nexus between the cell phone and the alleged criminal activity:

> (1) Officers found the cell phone on Steffens's person in the same pocket as a baggie of methamphetamine and on the scene where more drugs were later discovered; (2) the affidavit established probable cause that Steffens was involved in drug trafficking and included a "belief statement" that in the affiant officer's training and experience, drug traffickers use cell phones to conduct business, including to keep records and communicate regarding drug trafficking; and (3) Steffens told officers in an interview that the reason he had gone to the casino to meet with Lillich and drive Lillich's car (in which officers discovered drugs) was that a third party, who Steffens refused to name, had called and instructed him to do so. This is not a case in which the affidavit relied solely on the officer's "belief statement" or solely on the proximity of the phone to the drugs to establish the nexus.

*Id.* at 22–23.   Judge Mahoney also found that even if the affidavit did not establish probable cause, the motion to suppress should be denied due to the good faith exception to the exclusionary rule.  *Id.* at 25.

Judge Mahoney also analyzed the arguments and evidence presented at Steffens' *Franks* hearing, which was granted based on evidence offered at the suppression hearing. *Id.* at 26–27.  Judge Mahoney identified three statements from the affidavit that Steffens challenges:

> (1) that "[Sergeant] Lenz was aware that recent burglaries had occurred in the Sloan area in the overnight hours"; (2) that Sergeant Lenz had "experience with subjects entering the wash bays and drilling through the locks to steal the money from the wash machines"; and (3) that "[Sergeant] Lenz observed a subject looking out of the wash bay and looking around in

a suspicious way as if the subject was looking for someone or watching out
for potential police."

*Id.* at 26 (alterations in original) (quoting Doc. No. 50-2 at 3). Based on the evidence received at the suppression and *Franks* hearing, Judge Mahoney found that "a preponderance of the evidence does not establish a *Franks* violation." *Id.* at 27. Judge Mahoney provided a thorough analysis regarding each of the contested statements and the evidence received at the hearing. *See id.* at 27–30. Despite noting that some evidence contradicted portions of statements in the affidavit—such as the statements about "subjects . . . drilling through locks" and that the defendants were "looking around"—Judge Mahoney concluded that the evidence did not establish that these were "intentionally or recklessly false." *See id.* Finally, she stated:

> Even if all the challenged statements were omitted from the affidavit
> in their totality, the affidavit would still provide probable cause that Steffens
> and Lillich were involved in drug trafficking, based on the evidence that
> officers discovered pound quantities of methamphetamine in their vehicle.
> The statements establishing a nexus between their drug-trafficking activities
> and Steffens's cell phone would also still exist. Thus, even if the statements
> are false, and even if they were included in the affidavit intentionally or
> recklessly (a fact I seriously doubt), they were immaterial to the probable-
> cause finding, and no *Franks* violation occurred.

*Id.* at 29–30.


### 2. *Steffens' Objection*

Steffens' objection substantially echoes the arguments made in the brief supporting his initial motion to suppress. He argues that there was not a sufficient nexus between his phone and criminal activity to say that the warrant to search his phone was supported by probable cause. Doc. No. 86 at 4–6. Steffens argues that a nexus did not exist just because the phone was found in the same pocket as drugs and that the affidavit's belief statement "did not provide any information that is specific to" him. *Id.* at 5. He also argues that although he was called and asked to give Lillich a ride, nothing about this circumstance suggests a fair probability that the phone was connected to drug activity.

*Id.* Finally, Steffens argues that the good faith exception does not apply, stating that "the affidavit is so lacking in probable cause related to [Steffens'] phone that it is unreasonable for any officer to have relied on it." *Id.* at 6. While Steffens' objection does not address Judge Mahoney's findings regarding the *Franks* hearing, I will nonetheless discuss the *Franks* issue.

### 3. Analysis

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. When a warrant is required for a search, the warrant must be supported by probable cause. *Id.*; *see also United States v. Stevens*, 530 F.3d 714, 717–18 (8th Cir. 2008). Whether a warrant is supported by probable cause is a legal determination and is based on "whether, under the totality of the circumstances, there is a fair probability evidence of a crime will be found in a particular place." *United States v. Faulkner*, 826 F.3d 1139, 1144 (8th Cir. 2016). When reviewing whether probable cause existed for the warrant, "the duty of a reviewing court is simply to ensure that the [issuing judge] had a 'substantial basis . . . for conclud[ing]' that probable cause existed." *Illinois v. Gates*, 462 U.S. 213, 238–39 (1983) (second and third alteration in original) (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)).

Steffens' first argument regarding the search of his cell phone by warrant is that there was not a sufficient nexus between his phone and evidence of criminal activity. He argues that without a nexus, the warrant was not supported by probable cause.

For a warrant to be supported by probable cause, there must be a nexus "between the contraband [being sought] and the place to be searched." *United States v. Keele*, 589 F.3d 940, 943 (8th Cir. 2009) (alteration in original) (quoting *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000)). "Factors to consider in determining if a nexus exists include 'the nature of the crime and the reasonable, logical likelihood of finding useful evidence.'" *United States v. Johnson*, 848 F.3d 872, 878 (8th Cir. 2017) (quoting *United*

45

*States v. Colbert*, 828 F.3d 718, 726 (8th Cir. 2016)). Although evidence recovered during an initial investigation "may aid in establishing this nexus . . . [,] it is the contraband being sought in the warrant application, not that already recovered, that must be linked sufficiently to the place to be searched." *Keele*, 589 F.3d at 943.

In this case, the issue is whether there was a sufficient nexus between Steffens' cell phone and the alleged illegal activity, drug trafficking. Based on my de novo review, I agree with Judge Mahoney that there was a sufficient nexus between Steffens' phone and potential drug trafficking activity to find that the warrant was supported by probable cause. This is not a particularly close call. The nexus is provided by reasonable and logical inferences based on the totality of the circumstances and the nature of the crime investigated. *See United States v. Summage*, 481 F.3d 1075, 1078 (8th Cir. 2007) ("Judges 'may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant.'" (quoting *United States v. Thompson*, 210 F.3d 855, 860 (8th Cir. 2000)). Steffens was the driver of a car that contained pound quantity of a methamphetamine and had methamphetamine in the same pocket as his phone. He was also contacted on his cell phone by a person he refused to name and asked to give a ride to someone he did not know from a location that law enforcement knows is associated with drug trafficking activity. Law enforcement provided a belief statement detailing how cell phones are frequently used in trafficking drugs. Doc. No. 50-2 at 7–8. All these facts provided a substantial basis for concluding that probable cause existed. Therefore, the warrant was not invalid for want of a nexus.

Steffens' second argument is that the warrant to search his phone was invalid because it contained deliberately or recklessly false statements. Doc. No. 50-1 at 9–10. "A warrant issued on the basis of an affidavit that shows probable cause only because it contains a deliberate or reckless falsehood or omission violates the Fourth Amendment." *Technical Ordnance, Inc. v. United States*, 244 F.3d 641, 647 (8th Cir. 2001) (citing *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)). Because Steffens has not objected to Judge Mahoney's *Franks* findings in the R&R, I have reviewed them for clear error.

Judge Mahoney applied the appropriate legal standards in considering whether a Fourth Amendment violation occurred under *Franks*. *See* Doc. No. 75 at 25–30. She appropriately concluded that no violation occurred. *Id.* I find no error—clear or otherwise—in Judge Mahoney's factual findings and legal conclusions on this issue.

As a final point, because I have found that the warrant was supported by probable cause and was validly issued, there is no need to rely on the good faith exception in this case. However, because Steffens objected to Judge Mahoney's conclusion on this issue, I find it prudent to note that I have conducted a de novo review and agree with Judge Mahoney that even if the warrant was invalid for the reasons Steffens advances, the good faith exception would prevent suppression of the evidence obtained from his cell phone.

### F.    *Lillich's Motion to Sever*

#### 1.    *Judge Mahoney's Analysis*

Lillich argues that a joint trial is prejudicial due to his and Steffens' "inconsistent and hostile" defenses because "[t]he very nature of the facts [in this case] requires each Defendant to plead guilty or to blame the other." Doc. No. 42-1 at 7–8. Judge Mahoney recommends denying this motion. Doc. No. 75 at 32. After discussing applicable case law and Lillich's arguments, Judge Mahoney explained:

> [T]hat Lillich and Steffens may both point the finger at the other is insufficient to demonstrate prejudice. The jury will be "free to disbelieve . . . both of [defendants'] shift-the-blame-to-the-other-defendant stories." . . . . Moreover, any inconsistency between Lillich's and Steffens's defenses will not cause the jury to infer guilt, because the government intends to "offer[] evidence independent of the conflicting defenses to prove that" Lillich committed the drug offenses charged.

*Id.* at 32 (first omission in original) (second and third alteration in original) (citations omitted).

### 2.    Lillich's Objection

Lillich argues that his and Steffens' defenses are irreconcilable because they both must argue that the other knowingly possessed the drugs found in the vehicle.  Doc. No. 85 at 9–10.  He argues that "it is not a reasonable possibility that both defendants can be acquitted" because "any jury will find at least one of [them] guilty." *Id.* at 9.  Lillich thus contends that this causes clear prejudice such that the trials should be severed. *Id.*

### 3.    Analysis

In the federal system, there is a preference "for joint trials of defendants who are indicted together" because "[t]hey promote efficiency and 'serve the interest of justice by avoiding the scandal and inequity of inconsistent verdicts.'" *Zafiro v. United States*, 506 U.S. 534, 537 (1993) (quoting *Richardson v. Marsh*, 481 U.S. 200, 209 (1987)).  However, under Federal Rule of Criminal Procedure 14(a), "the court may . . . sever the defendants' trials, or provide any other relief that justice requires," if a consolidated "trial appears to prejudice a defendant or the government."  Severance is justified "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539.  To meet this burden, a defendant must show "real" and "clear" prejudice. *United States v. Sandstrom*, 594 F.3d 634, 644 (8th Cir. 2010) (citation omitted).  "A defendant can show real prejudice either by showing that his defense is irreconcilable with the defense of his codefendant . . . or that the jury will be unable to compartmentalize the evidence as it relates to separate defendants." *Id.* (alteration in original) (quoting *United States v. Shivers*, 66 F.3d 938, 940 (8th Cir. 1995)).

To the first point, defendants' defenses are not irreconcilable just because they may be mutually antagonistic. *See Zafiro*, 506 U.S. at 538–39; *Sandstrom*, 594 F.3d at 644.  "Antagonistic defenses require severance only when there is a danger that the jury will unjustifiably infer that *this conflict alone demonstrates that both are guilty*."

48

*Sandstrom*, 594 F.3d at 644 (emphasis in original) (internal quotation marks omitted) (quoting *United States v. Delpit*, 94 F.3d 1134, 1143 (8th Cir. 1996)).

To the second point, the Supreme Court has provided examples of the types of circumstances in which a jury may have trouble "compartmentaliz[ing] the evidence as it relates to separate defendants." *See Zafiro*, 506 U.S. at 538–40. One circumstance with a greater risk of prejudice is "when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant." *Id.* at 539. The same is true when there is exculpatory evidence that could be admitted for a defendant if tried alone but is unavailable in a joint trial. *Id.* There is also a heightened risk of prejudice "[w]hen many defendants are tried together in a complex case and they have markedly different degrees of culpability." *Id.*

Based on my de novo review, I agree with Judge Mahoney that severance is not warranted in this case. Lillich has not shown that his defense is irreconcilable with Steffens'. He does little more than make bare assertions that his and Steffens' defenses will be mutually antagonistic and lead to prejudice. This is insufficient to meet the burden of proof required for severance. *See Zafiro*, 506 U.S. at 539–40 (finding that severance was not warranted when the defendants "contend[ed] that the very nature of their defenses, without more, prejudiced them" and "d[id] not articulate any specific instances of prejudice"). There is no significant risk that the inconsistency itself will lead a jury to unjustifiably conclude that both he and Steffens are guilty, *see Sandstrom*, 594 F.3d at 644, and the fact that eliminating the inconsistent defenses by severance may give either defendant a greater chance of acquittal is insufficient to warrant severance. *See Zafiro*, 506 U.S. at 540.

Additionally, Lillich has not shown he will be prejudiced by a jury's inability to compartmentalize the evidence in this case. He has not pointed to any specific evidence that may be admissible only against Steffens' but is prejudicial to himself, or evidence that is unavailable to him in a joint trial. The fact that the Government has charged the defendants with the same offenses and seeks to prove that there is sufficient evidence to

49

convict both of them also speaks against finding prejudice. *See Zafiro*, 506 U.S. at 540 (finding less risk of prejudice when the Government argued that all four defendants were guilty of the alleged crimes).

Lastly, it is important to note that even if there is a risk of prejudice, severance is not necessarily required. *See id.* at 538–39 (noting that even if prejudice is shown, the district court may tailor a solution to reduce or eliminate the prejudice). When the risk of prejudice is high, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Id.* at 539. In this case, there is no reason to believe that any prejudice that might arise cannot be addressed by a remedy other than severance. For these reasons, Lillich's motion to sever is denied.

## V.    CONCLUSION

For the reasons set forth herein:

1.    The Government's objections (Doc. No. 84) to the Report and Recommendation (Doc. No. 75) are **sustained in part and overruled in part**. They are **sustained** as to the nature of the initial encounter, as I find that it was consensual, and **overruled** as to the detention of Lillich during the second encounter because officers did not have reasonable suspicion to detain Lillich at the time he requested to leave.

2.    Lillich's objections (Doc. No. 85) to the Report and Recommendation are **overruled**.

3.    Steffens' objections (Doc. No. 86) to the Report and Recommendation are **overruled**.

4.    I **accept** the Report and Recommendation, except as to Judge Mahoney's conclusion that the initial encounter between law enforcement and the defendants was not consensual. I have sustained the Government's objection on this issue and find that the initial encounter was consensual. The Report and Recommendation is hereby **modified** to this extent.

50

5.      In accordance with the Report and Recommendation, as modified:

a.      Lillich's motion to suppress (Doc. No. 27) is **granted in part** and **denied in part**.  All of Lillich's statements made during the second encounter, after he requested to leave, are **suppressed**.  The motion is **denied** in all other respects.

b.      Steffens' motion to suppress (Doc. No. 50) is **denied**.

c.      Lillich's motion to suppress (Doc. No. 56) is **denied**.

d.      Lillich's motion to sever (Doc. No. 42) is **denied**.


**IT IS SO ORDERED.**

**DATED** this 4th day of November, 2019.

_____

Leonard T. Strand, Chief Judge